UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YOLANDA CLARICE BURROWS,

|                    |                          |
|--------------------|--------------------------|
| Plaintiff,         | Case No. 12-cv-10109     |
|                    | Honorable Avern Cohn     |
|                    | Magistrate Judge David R. Grand |

v.

COMMISSIONER OF
SOCIAL SECURITY,

Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 22]

Plaintiff Yolanda Clarice Burrows ("Burrows") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [14, 22], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the court finds that the Administrative Law Judge's ("ALJ") conclusion that Burrows was not disabled under the Act is not supported by substantial evidence. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [22] be DENIED, Burrows' Motion for Summary Judgment [14] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED

back to the ALJ for further proceedings consistent with this Recommendation.

## II.    REPORT

### A.    Procedural History

On March 26, 2002, Burrows filed an application for DIB.  (Tr. 15).  In a decision dated January 28, 2004, ALJ Jerome Blum denied Burrows' application for DIB.  (*Id.*).  On April 14, 2004, the Appeals Council issued an order remanding the case to ALJ Blum for further proceedings.  (*Id.*).  On June 29, 2005, ALJ Blum held another hearing and, by decision dated October 13, 2005, he again denied Burrows' application for DIB.  (*Id.*).  Burrows did not appeal that decision and, as such, ALJ Blum's 2005 decision is considered final and binding.  (Tr. 16).

On April 6, 2009 Burrows filed a second application for DIB, alleging disability beginning on February 20, 2002.  (Tr. 89-95).  That same day, Burrows filed an application for SSI, also alleging disability beginning on February 20, 2002.  (Tr. 96-98).  Burrows' applications for DIB and SSI were both denied initially on June 8, 2009.  (Tr. 58-66).  Thereafter, Burrows filed a timely request for an administrative hearing, which was held on November 23, 2009, before ALJ Charles Reite.  (Tr. 30-55).  Burrows, who was not represented by an attorney, testified at the hearing, as did vocational expert ("VE") James Beeman.  (*Id.*).  On April 29, 2010, the ALJ issued a written decision in which he found that Burrows was not disabled.  (Tr. 15-26).  On December 12, 2011, the Appeals Council denied review.  (Tr. 1-3).  Burrows filed for judicial review of the final decision on January 10, 2012 [1].

### B.    Background

#### 1.    *Disability Reports*

In an April 6, 2009 disability field office report, Burrows reported that her alleged onset date was February 20, 2002.  (Tr. 123).  The claims examiner noted that, during a face-to-face interview, Burrows had difficulty with coherency, as well as understanding, concentrating,

talking, and answering questions. (Tr. 126). The claims examiner further noted that Burrows:

> . . . just sat at [the] interview with her head down and closed eyes. She would not look up and all her answers were, "I don't remember" and "I don't know." I could not get any answers out of her for doctor's names, addresses, medications, hospital visits or anything. She only remembered that she seen [sic] a Dr. Menderetta on 12 mile, but it has [been] many many many years ago.

(*Id.*).

In an undated disability report, Burrows indicated that her ability to work is limited by major depression. (Tr. 129). When describing how this condition limits her ability to work, Burrows stated, "I am psychologically impaired." (*Id.*). Burrows reported that she became unable to work on February 20, 2002 because she was "harassed," and she has not worked since that time. (*Id.*). Prior to stopping work, Burrows worked as a letter carrier for the United States Postal Service from 1988-2002. (Tr. 130). In that job, she loaded and unloaded trucks, sorted and carried mail, and delivered parcels. (*Id.*). She was required to walk, stand, sit, reach, handle both large and small objects, and write, type or handle small objects several hours per day. (*Id.*). She was frequently required to lift less than ten pounds, and occasionally had to lift up to eighty pounds. (*Id.*). Burrows completed three years of college, ending in 1992. (Tr. 132). She indicated that she had not seen any doctors or therapists regarding her medical condition. (Tr. 131). She had not had any medical tests performed, and she was not taking any medication. (Tr. 132).

In a function report dated April 30, 2009, Burrows reported that she lives in a house with her family. (Tr. 134). When asked what she could do before the onset of her condition that she is no longer able to do, Burrows said only, "Live the Great American Dream!!!" (Tr. 135). Her condition interferes with her ability to sleep. (*Id.*). She is able to attend to her own personal care, although she needs reminders from time to time. (Tr. 135-36). She prepares her own meals ("cereal and milk"), and when asked what household chores she is able to do, Burrows said, "I

3

can do it all!" (as long as she mentally prepares herself). (Tr. 136). She goes outside when she is "forced to." (Tr. 137). She is able to walk, ride public transportation, and drive a car.[1] (*Id.*). She goes shopping and is able to count change, handle a savings account, and use a checkbook, but she is unable to pay bills because she "[has] no Federal Reserve Notes to use for bills." (*Id.*). Her ability to handle money has changed since the onset of her condition, and she finds it "hard to concentrate and remember my strategy." (Tr. 138). Her only hobby is "freeing [herself] from this Great American Nightmare." (Tr. 138). She spends time with others, but does not go anywhere on a regular basis. (*Id.*). She has problems getting along with family, friends, and neighbors "when they try to convince [her] that the Law protects everyone!" (Tr. 139).

When asked to identify functions impacted by her condition, Burrows checked talking, seeing, memory, completing tasks, concentration, understanding, using her hands, and getting along with others, saying that, "The oppression I am forced to endure has crippled me." (*Id.*). She does not know how long she can pay attention, and she does not know how well she follows written instructions, but she is able to finish what she starts and follow spoken instructions. (*Id.*). When asked how well she handles stress, Burrows reported that she "suffered 3 documented mental breakdowns before the [Postal Service] ignored the laws and conspired with the EEOC and District Court to deny me my Human Rights." (Tr. 140).

In a third party function report dated May 4, 2009, Burrows' friend, Robert Sandridge, reported that Burrows spends most of her time watching television or going for walks. (Tr. 142). He indicated that Burrows takes care of her two boys, along with a cat. (Tr. 143). He indicated that Burrows cannot "deal with people like she used to" and is "always sleeping during the day

---

[1] Burrows checked a box indicating that she drives, but then answered the follow-up question, "If you don't drive, explain why not," by saying, "I have no Federal Reserve Notes to give to the State to enforce my right to travel in my own personal property." (Tr. 137).

time." (*Id.*).  Sandridge reported that Burrows prepares her own meals (frozen dinners or cereal and milk) because she never was taught how to cook.  (Tr. 144).  He reported that Burrows does not finish what she starts and does not go outside alone because she is "scared of people."  (Tr. 144-45).  She does not get along with people, thinks everyone is out to get her, and keeps to herself.  (Tr. 146-47).  Sandridge confirmed Burrows' difficulty talking, seeing, completing tasks, understanding, following instructions, getting along with others, and with memory and concentration.  (Tr. 147).  According to Sandridge, Burrows cannot follow written instructions, does not get along well with authority figures, and does not handle stress or changes in routine well.  (Tr. 147-48).

In an undated disability appeals report, Burrows reported that there had been no change in her condition since her last report.  (Tr. 157).  Since the time of her last report, she had not treated with any doctors, hospitals, or clinics for her condition, had had no medical tests, and had taken no medication.  (Tr. 157-58).  There had been no change in her daily activities since her last report.  (Tr. 158).

### 2.    *Plaintiff's Testimony*

At the November 23, 2009 hearing before the ALJ, Burrows testified that she has never been married.  (Tr. 37).  She has two children, ages 24 and 22 at the time of the hearing, one of whom lives with her.  (Tr. 45-46).  She finished high school and attended three years of college before dropping out to work full-time for the Postal Service.  (Tr. 37-38).  In the past fifteen years, Burrows' only employment was with the Postal Service, but she has not worked there since December 11, 2000.  (Tr. 38).  She testified that she left this job because, after she suffered her "third mental breakdown," her employer's physician said that she could return to work, but she refused.  (Tr. 42-43).

5

When asked why she has not worked since December 2000, Burrows said that she suffers from anxiety and that "there's something in my head that causes me not to work." (Tr. 40). When asked whether she had seen any doctors or psychiatrists regarding her condition, Burrows said that she had begun seeing a psychiatrist in August 2009, after she was approved for state disability benefits. (Tr. 41). The following exchange then occurred:

> Q.   Do you have the name of the doctor? We'll get some records from her and help your file.
>
> A.   Yes, I have a name. I have her name.
>
> Q.   Do you have the name and address there with you by any chance?
>
> A.   I have a card.
>
> Q.   Okay. Then maybe Debra [the hearing monitor ("HM")] can get that information for me and pass it on.
>
> HM:  I'll make a copy of the business card after the hearing if you'd like.
>
> ALJ: Yeah, that'd be – that'd be good. We'll try and get some records from them, from the treating person here . . . . We'll try and get those records.

(Tr. 41-42). Near the conclusion of the hearing, the ALJ reiterated, "We're going to try and get the record from your current treating psychiatrist . . . ." (Tr. 54).

In terms of her living arrangements, Burrows testified that she was homeless from June 2008 through November 2008 and slept in her van during that period of time. (Tr. 45). Since then, she has lived in a house with her adult son and nephew. (Tr. 45-46). She is able to do some housework (cleaning, sweeping) and go shopping. (Tr. 46-47). Burrows further testified that she was approved for state disability in March 2009 and, since that time, has been receiving $269 per month from the State of Michigan.[2] (Tr. 47).

---

[2] It appears that, by letter dated October 28, 2009 (sent prior to the administrative hearing in this manner), Burrows alerted the ALJ to the fact that the "State of Michigan Department of Human Services considered Yolanda Burrows disabled," and requested that the ALJ subpoena related

3.      *Written Correspondence Submitted by Burrows*

As indicated above, during the course of the hearing in this matter, the record was left open specifically for the ALJ to obtain records from Burrows' then-current treating psychiatrist (identified at the hearing as Tracy Zakaright), as well as to allow Burrows to submit records regarding her approval for state disability benefits.  (Tr. 42, 47, 54).  On March 10, 2010, Burrows did submit a handwritten letter, in which she advised the ALJ that she was contemplating discontinuing therapy because one therapist reportedly stated that Burrows was giving her "nightmares," and because a second therapist allegedly violated her privacy.  (Tr. 162).  Burrows also reported that she was being evicted from her home and that her lights had been disconnected.  (Tr. 162-63).  Importantly, Burrows' letter references a discussion with her "therapist" about the possibility of her institutionalization, and makes wild assertions such as her claim that "the hate clan that conspired to take away my livelihood and caused my disability is at work here."  (Tr. 163).

Burrows did not submit any records pertaining to her application or approval for state disability benefits, nor is there any indication that she submitted records from her treating psychiatrist.

4.      *Medical Evidence*

(a)      *Oakland County Probate Court*

Following the administrative hearing in this case, the ALJ requested and obtained records

---

records.  (Tr. 164).  At the hearing, when it became apparent that the administrative record contained no documentary evidence related to Burrows' application or approval for state disability benefits, the ALJ asked Burrows whether she had any relevant paperwork, and she said, "I can fax that to you once I get home."  (Tr. 47).  There is no indication that she ever submitted such paperwork, however.

relating to Burrows from the Oakland County Probate Court.[3]  (Tr. 171-72).   The records

provided include a psychological evaluation, dated April 22, 2002, which was conducted in order

to determine whether Burrows could provide proper structure and guidance for her then-minor

son, who was in trouble with the law.  (Tr. 175-80).  Burrows appeared for this appointment 45

minutes late, but was dressed appropriately and her grooming and hygiene were adequate.  (Tr.

177).  During the evaluation, she made very little (if any) eye contact and appeared to be quite

lethargic.  (*Id.*).  She was oriented to person, place, and time, and her long-term and short-term

memory appeared to be intact.  (*Id.*).  She displayed a very flattened range of emotion, with

blunted affect, and presented as "someone who is very depressed."  (*Id.*).  Although she denied

any history of hallucinations, delusions, or suicidal ideations, she admitted "that she has had

homicidal ideation and had a plan to buy a gun in response to her supervisor who she believed

was harassing her."  (*Id.*).  Her overall intellectual ability was in the average range.  (Tr. 179).

Although the ALJ's decision discusses this examination, he makes no mention of the

following assessment, contained in the "Summary and Recommendations" section:

> Ms. Burrows' personality profile indicates that she is suffering from very
> significant symptoms of a depressive nature.  These symptoms may have include
> [sic] social withdrawal, discouragement, apprehension about her future, a slowing
> of mental and physical processes, and at times, may become so severe that she has
> disturbances of thinking or mood.  Overall, it appears to be a severe mental
> disorder, and she likely has daily feelings of dejection, apathy, and pessimism,
> and she often likely feels depressed and morose, and follows a simple, repetitive
> and dependent life pattern.

(*Id.*).  The examining psychologist further indicated a belief that Burrows might benefit from

"psychotropic intervention," although he recognized that this might not be feasible, since

Burrows had "repeatedly stated that she would refuse to take medication should a psychiatrist

---

[3] It appears that the ALJ also attempted to obtain medical records regarding Burrows from the
United States Postal Service, but he was informed that no such records exist.  (Tr. 181-82).

8

prescribe them for her." (*Id.*). The psychologist also believed that Burrows would benefit from counseling to address the "symptoms of depression and anxiety that appear to be effecting [sic] every aspect of her life." (Tr. 180).

*(b)    Consultative Psychological Evaluation*

On May 13, 2009, Burrows underwent a consultative psychological evaluation with Dr. Sung-Ran Cho. (Tr. 216-20). In his report, Dr. Cho indicated that Burrows had no history of psychiatric hospitalizations and that, although she treated with a psychiatrist from 1997 to 2001 for "job harassment," she refused to take medication that the psychiatrist recommended for depression. (Tr. 216). Dr. Cho noted that Burrows was clean and casually groomed. (Tr. 218). She cried throughout the interview, and then "screamed and yelled" when talking about her employment problems. (*Id.*). Her affect was irritable and depressed. (*Id.*). She was able to repeat 7 numbers forward and 4 numbers backward, was able to name three past presidents, and correctly stated her birthday. (Tr. 218-19). Dr. Cho diagnosed Burrows with Bipolar II disorder, depressed type, and paranoid personality disorder, gave her a GAF score of 50, and rated her prognosis as "poor." (Tr. 219-20).

*(c)    Residual Functional Capacity Assessment*

On May 26, 2009, James Tripp, Ed. D., a state agency psychologist, reviewed Burrows' records and completed a Psychiatric Review Technique and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 197-214). Dr. Tripp noted that Burrows suffers from an Affective Disorder (as defined in Listing 12.04) and a Personality Disorder (as defined in Listing 12.08). (Tr. 201). However, Dr. Tripp further opined that Burrows has only mild limitations with respect to her activities of daily living and maintaining social functioning, and moderate difficulties with respect to maintaining concentration, persistence, or pace, with no episodes of

9

decompensation.  (Tr. 211).  Specifically, in his RFC Assessment, Dr. Tripp opined that Burrows is not significantly limited in her ability to understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule; make simple work-related decisions; complete a normal workday without interruptions from psychological symptoms; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without distracting them; and maintain socially appropriate behavior.  (Tr. 197-98).  Dr. Tripp did, however, opine that Burrows is moderately limited in the ability to understand, remember and carry out detailed instructions and to respond appropriately to changes in the work setting.  (*Id.*).  In conclusion, Dr. Tripp opined that Burrows can perform "simple, sustained, unskilled tasks with persistence."  (Tr. 199).

### 4.   *Vocational Expert's Testimony*

Jeff Beeman testified as an independent vocational expert ("VE").  (Tr. 48-54).  The VE characterized Burrows' past relevant work – both as a mail carrier and as a postal parcel clerk – as semi-skilled in nature, and medium exertion (although she performed it at the heavy exertional level).  (Tr. 50).  The ALJ asked the VE to imagine a claimant of Burrows' age, education, and work experience, who was able to perform medium exertional work, with the following nonexertional limitations:  only moderate social interaction (i.e., up to 20% of the time), primarily with supervisors but also with co-workers and the public; and a mild limitation with respect to concentration, persistence, and pace (in that she can maintain concentration, persistence, and pace up to approximately 90% of the time during the course of a workday).  (Tr. 51-53).  The VE testified that the hypothetical individual would not be capable of performing Burrows' past relevant work.  (Tr. 52).  However, the VE testified that the hypothetical

individual would be capable of working in light or medium, unskilled jobs, such as assembler small products (800,000 jobs in the United States) or machine operator (1,000,000 jobs in the United States).[4]  (Tr. 53).  The VE further testified that if the hypothetical individual had a moderate limitation with respect to concentration, persistence, and pace (in that she can maintain concentration, persistence, and pace only up to approximately 80% of the time during the course of a workday), she would not be able to sustain competitive employment.  (Tr. 52-53).

### C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

---

[4] The VE further testified that there would be a 60-70% reduction in the number of jobs available in these representative occupations due to Burrows' moderate social activity and mild concentration limitations.  (Tr. 53).  Such erosion is reflected in the number of available jobs cited above.  (*Id.*).

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Burrows was not disabled under the Act.  At Step One, the ALJ found that Burrows has not engaged in substantial gainful activity since February 20, 2002, her alleged onset date.  (Tr. 18).  At Step Two, the ALJ found that Burrows has the severe impairment of bipolar disorder.  (*Id.*).  At Step Three, the ALJ found that Burrows' mental impairment did not meet or medically equal Listing 12.04 (for affective disorders) or Listing 12.06 (for anxiety-related disorders).  (Tr. 20-21).

The ALJ then assessed Burrows' residual functional capacity ("RFC"), concluding that Burrows was capable of performing medium work, as defined in 20 C.F.R. §404.1567(c) and §404.967(c), except as follows:  she was limited to moderate interaction (i.e., up to 20% of the time) primarily with supervisors but also with co-workers and the public; and she could maintain concentration, persistence and pace only up to approximately 90% of the time during the course of a workday.  (Tr. 21-24).

At Step Four, the ALJ determined that Burrows is unable to perform her past relevant

work as a mail carrier, which was semi-skilled in nature and performed at a medium or heavy level of exertion. (Tr. 24). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Burrows is capable of performing a significant number of jobs that exist in the national economy. (Tr. 25-26). As a result, the ALJ concluded that Burrows is not disabled under the Act. (Tr. 26).

**E.   Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court

is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499

F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).

The court "may look to any evidence in the record, regardless of whether it has been cited by the

Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health*

*& Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that

either the ALJ or this court discuss every piece of evidence in the administrative record.

*Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can

consider all evidence without directly addressing in his written decision every piece of evidence

submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is

supported by substantial evidence, "it must be affirmed even if the reviewing court would decide

the matter differently and even if substantial evidence also supports the opposite conclusion."

*Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations

omitted).

      **F.**      **Analysis**

      Burrows makes two arguments before this court:  first, the ALJ's determination that she

is not disabled is not supported by substantial evidence; and, second, the ALJ erred in failing to

properly develop the record, particularly given the fact that Burrows suffers from a mental

impairment and was not represented by counsel at the administrative hearing.  These arguments,

which are related, are discussed below.

      *1.*      *The ALJ Failed to Adequately Develop the Record*

      While the claimant bears the ultimate burden of establishing that she is entitled to

disability benefits, courts have recognized that social security proceedings are "inquisitorial

rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000).  As a result, an ALJ has an

affirmative duty to develop the factual record upon which his decision rests, regardless of

14

whether the claimant is represented by legal counsel at the administrative hearing.  *See Lashley v. Secretary of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971) (recognizing that the responsibility for ensuring that every claimant receives a full and fair hearing lies with the administrative law judge)).

However, where the claimant is without counsel, incapable of presenting an effective case, and unfamiliar with hearing procedures, the ALJ has a "special, heightened duty" to develop the administrative record and ensure a fair hearing.  *See Wilson v. Commissioner of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (citing *Lashley*, 708 F.2d at 1051-52; *Nabours v. Commissioner of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 1986).  To satisfy this duty, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Lashley*, 708 F.2d at 1052 (internal citations omitted).  This is especially true in situations where the unrepresented claimant suffers from a mental impairment.  *See Morlando v. Astrue*, 2011 WL 4396785, at *4 (D. Conn. Sept. 20, 2011) ("In addition to the special solicitude required for *pro se* claimants, the Second Circuit has also emphasized the extra care necessary 'when adjudicating the claims of a litigant whose mental capacity is in question.'") (internal citations omitted).

a.   Records from Burrows' Treating Physician

Whether an ALJ has satisfied his "special, heightened duty" to develop the record is determined on a case-by-case basis.  *See Osburn v. Apfel*, 1999 WL 503528, at *7 (6th Cir. July 9, 1999) (internal citation omitted).  Although there is no bright line test to be applied, courts have recognized that, "[f]ailure by an ALJ to fully develop the factual record in a particular matter is often evidenced by superficial or perfunctory questioning, as well as a *failure to obtain*

15

*all available medical records and documentation.*"   *Vaca v. Commissioner of Soc. Sec.*, 2010 WL 821656, at * 6 (W.D. Mich. Mar. 4, 2010) (emphasis added) (citing cases).  Indeed, courts have explicitly stated: "An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing."  *Figard v. Commissioner of Soc. Sec.,* 2010 WL 3891211, at *7 (W.D. Mich. July 1, 2010) (quoting *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996)).

This is particularly true in situations where the ALJ's duty to develop the record intersects with the "treating physician rule," which requires an ALJ to give controlling weight to the opinions of treating physicians, so long as those opinions are well-supported by clinical evidence and not inconsistent with the other substantial evidence in the record.  *See, e.g., Williams v. Barnhart*, 2007 WL 924207, at *7 (S.D.N.Y. Mar. 27, 2007) (citing 20 C.F.R. §404.1527).  Because the opinions of a treating physician are of critical importance, "[w]hen the record before the ALJ is incomplete or inadequate, an ALJ's failure to request the opinion of a *pro se* claimant's treating physician is grounds for remand."  *Id.* at *8; *see also Watt v. Astrue*, 2011 WL 3319993, at * 5 (C.D. Cal. July 28, 2011).  Common sense suggests that where the ALJ affirmatively advises the claimant that he will seek particular relevant records, his failure to do so unfairly prejudices the claimant, who might otherwise have sought them on her own.

In this case, when asked at the hearing whether she had seen any doctors or psychiatrists regarding her condition, Burrows testified that she had been treating with a psychiatrist since August 2009.  (Tr. 41).  The following exchange then occurred:

> Q.   Do you have the name of the doctor?  **We'll get some records from her and help your file.**
>
> A.   Yes, I have a name.  I have her name.
>
> Q.   Do you have the name and address there with you by any chance?

> A.     I have a card.
>
> Q.     Okay.  Then maybe Debra [the hearing monitor ("HM")] can get that information for me and pass it on.
>
> HM:    I'll make a copy of the business card after the hearing if you'd like.
>
> ALJ:   Yeah, that'd be – that'd be good.  **We'll try and get some records from them, from the treating person here . . . .  We'll try and get those records.**

(Tr. 41-42) (emphasis added).  Near the conclusion of the hearing, the ALJ reiterated, "**We're going to try and get the record from your current treating psychiatrist . . . .**" (Tr. 54) (emphasis added).

Based on a review of the administrative record, it appears that despite the ALJ's representations to Burrows that he would attempt to obtain records from her treating psychiatrist, he failed to do so.  While the administrative record contains correspondence from the ALJ to both the Oakland County Psychological Department (Tr. 172) and Burrows' former employer, USPS (Tr. 181-82), in an attempt to obtain relevant medical records from those entities, there is no indication that the ALJ ever sought records from Burrows' treating psychiatrist (identified at the hearing as Tracy Zakaright).[5]

The ALJ's apparent failure to attempt to obtain these records – particularly given: (1) their centrality to Burrows' claims[6], *supra* at 15-16, and (2) the ALJ's explicit representations at

---

[5]  The Commissioner argues that there "is nothing in the record or Plaintiff's multiple correspondences with the ALJ and Appeals Council indicating that she ever provided the requisite contact information [for Tracy Zakaright]." (Doc. #22 at 14).  However, it is clear that Burrows indicated at the hearing that she had with her a business card containing the psychiatrist's contact information, that she attempted to place that contact information on the record, and that she was told to provide the business card to the Hearing Monitor at the close of the hearing.  (Tr. 41-42).  Burrows claims that she did so (Doc. #23 at 4), and there is no reason to believe differently.

[6]  Although the records in question relate to appointments that took place much closer to the hearing date than Burrows' alleged onset date, that is not a basis to say their absence from the record is irrelevant.  Burrows had been diagnosed as bipolar by the consultative physician, and

the hearing that he would obtain those records for Burrows – prejudiced Burrows' right to a full and fair hearing on the merits, and therefore constitutes error warranting remand.  *See Rabbers*, 582 F.3d at 654; *Mejias v. Apfel*, 1998 WL 651052, at *7 (S.D.N.Y. Sept. 23, 1998) ("The ALJ's failure to obtain plaintiff's records from her treating sources is particularly significant because, as noted above, he implied at the conclusion of the hearing that he would obtain the records . . . .").  *See also supra* at 15-16.

Moreover, the ALJ compounded his error by holding against Burrows the fact that the record contained no information from her treating psychiatrist.   In evaluating Burrows' testimony regarding the intensity, persistence, and limiting effects of her symptoms, the ALJ repeatedly dismissed Burrows' hearing testimony that she recently had begun treating with a psychiatrist (after she was approved for state disability benefits and, therefore, had some form of health insurance) (Tr. 41), saying the following at various points in his decision:

- "The claimant never sought recent psychiatric treatment . . . ."  (Tr. 22).

- Only in connection with her EEOC harassment lawsuit did the claimant see a psychiatrist."  (*Id.*).

- "Further, there is no evidence that the claimant sought out or received treatment other than in connection with her EEOC lawsuit against the U.S. Postal Service for workplace harassment."  (Tr. 24).

In addition to these mischaracterizations of Burrows' hearing testimony, the ALJ also relied on a March 10, 2010 letter drafted by Burrows to support his conclusion that Burrows "is not seeking any professional assistance with respect to her mental impairment . . . ."  (Tr. 22). The plain language of that letter, however, indicates just the opposite:  Burrows said that she was "*contemplating* not seeking *any more* professional help," which suggests that she was, at the time

---

had written a letter to the ALJ which was bizarre and which indicated that she and her physician (whose records are in issue) had discussed the possibility of her institutionalization.  (Tr. 163). At a minimum, the missing records could have supported a finding of disability with an onset date later than the one alleged by Burrows.

the letter was written, treating with a psychiatrist.  (Tr. 162) (emphasis added).  Though certainly not information available to the ALJ at the time, it appears that Burrows has, in fact, continued to see a psychiatrist.  *Infra*, at fn. 10.  Moreover, the letter's contents – which alternates between lucid and bizarre (and which references a discussion with her therapist about a possible institutionalization) – coupled with Dr. Cho's bipolar diagnosis (Tr. 219-20), gave the ALJ all the more reason to obtain the underlying treating physician medical records.

The Commissioner argues that *Wilson's* "heightened duty" standard does not apply here because "the hearing transcripts as well as Plaintiff's correspondences and court submissions reveal her grasp of the proceedings and the adequacy of her case presentation."  (Doc. #22 at 9). While the court agrees that Burrows' apparently self-prepared summary judgment briefing suggests she has a reasonable level of understanding of the relevant substantive laws[7], the court cannot reach the same conclusion with respect to her understanding of (and ability to handle) the relevant hearing procedures.  Burrows' testimony was short, amounting to only 11 transcript pages, much of which covered basic background information only marginally related to her alleged disability.  Despite the sparse coverage of her alleged mental impairments, when asked whether there was anything else about "her situation" that the ALJ ought to know, Burrows simply responded "No."  (Tr. 47-48).  Many of the most important records that should have been before the ALJ were missing.  Most importantly to the instant analysis, the ALJ specifically stated that he would attempt to obtain relevant treating physician records, but apparently did not do so.  Under these circumstances, and in light of Burrows' alleged mental infirmities (and a finding by the consultative examiner that she suffers from a bipolar disorder (Tr. 219-220)), the

---

[7] While her summary judgment briefing was largely coherent and logical, the ALJ was privy to other materials authored by her (e.g., Burrows' March 10, 2010 letter to the ALJ) which paint a very different picture of her lucidity.  *See supra* at 7; Tr. 163.

court concludes that the ALJ did, in fact, have an obligation to at least seek the treating physician records. *See supra* at 14-16.

In sum, on remand, the ALJ should attempt to obtain medical records from those persons Burrows has identified as her treating physicians, *see infra* fn. 10, and explain the consideration he gives to such records in formulating his decision as to whether Burrows is disabled under the Act.

> b.    Records Pertaining to Burrows' Approval for State Disability
>        Benefits

Burrows testified at the administrative hearing that she was approved for state disability benefits in March 2009 and, at the time of the hearing, she was receiving $269 per month from the State of Michigan.  (Tr. 47).  Despite Burrows' testimony in this respect, there is no indication in the record that that the ALJ sought to obtain records related to Burrows' application for state disability benefits or that he gave any consideration to the disability determination made by the State of Michigan.[8]  This is true despite the fact that he sent out requests to other agencies (Oakland County and the USPS) in an attempt to obtain what he deemed to be relevant medical records.

While a disability determination made by another agency is not binding on the Commissioner (*see* 20 C.F.R. §404.1504), SSR 06-03p provides that state disability decisions "cannot be ignored and must be considered."  Moreover, the adjudicator "should explain the consideration given to these decisions . . . ."  *Id.*  In this case, there is no indication that the ALJ reviewed any records related to the State of Michigan's disability determination.  Nor is there any indication that he gave that determination any consideration whatsoever in reaching his

---

[8] At the hearing, Burrows indicated that she could fax to the ALJ records pertaining to her approval for state disability benefits.  (Tr. 47).  There is no indication in the record that she did so.  Given Burrows' alleged mental impairments, however, as well as the fact that she was unrepresented at the hearing, the ALJ should, on remand, ensure that such records are obtained.

conclusion that Burrows is not disabled.  On remand, the ALJ should obtain records pertaining to Burrows' approval for state disability benefits and explain the consideration he gives to such records in formulating his decision as to whether Burrows is disabled under the Act.

> 2.     *The ALJ's Determination that Burrows is Not Disabled is Not Supported by Substantial Evidence*

For all of the reasons set forth above, the ALJ's determination that Burrows is not disabled is not supported by substantial evidence.  The administrative hearing in this case raises more questions than it answers.  For example, Burrows testified that she was treating with a psychiatrist, but there are no treating physician records in evidence; Burrows testified that she received state disability benefits, but those records were not obtained; Burrows testified that there was a prior ALJ decision denying her application for DIB, but neither that decision, nor its supporting medical documentation were made a part of this record.  Without those records – most critically, the records from Burrows' treating psychiatrist – the ALJ's conclusions at Step Three, Step Four, and Step Five of the sequential analysis, as well as his determination as to Burrows' RFC, are not supported by substantial evidence.[9]  *See, e.g., Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984) (when an ALJ fails to develop the record, he does not have sufficient facts to make a decision and, thus, his decision is not supported by substantial evidence).

On remand, the Commissioner should attempt to obtain (1) copies of records from

---

[9] This is particularly true in light of other evidence in the record – namely: the Oakland County Probate Court evaluation, which concluded that Burrows was "very depressed," had a "severe mental disorder," and would benefit from psychotropic intervention (Tr. 177, 179); Dr. Cho's conclusion that Burrows suffers from Bipolar II disorder and a paranoid personality disorder, has a GAF score of 50, and a "poor" prognosis (Tr. 219-20); and the fact that the ALJ's conclusion that Burrows is not disabled was based almost exclusively on the opinion of a non-examining physician (Dr. Tripp) and inaccurate statements that Burrows had not recently sought psychological treatment.

Burrows' treating psychiatrist(s), psychologist(s) or other physicians,[10] (2) copies of documents pertaining to Burrows' application and approval for state disability benefits, and (3) a copy of ALJ Blum's 2005 decision and the medical evidence underlying that decision. All of this evidence should be considered in evaluating whether Burrows is disabled under the Act.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [22] be DENIED, Burrows' Motion for Summary Judgment [14] be GRANTED IN PART, the ALJ's decision be REVERSED, and this case be REMANDED for further proceedings consistent with this Recommendation.

Dated: September 28, 2012                          s/David R. Grand
Ann Arbor, Michigan                                DAVID R. GRAND
                                                   United States Magistrate Judge

## <u>NOTICE</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

---

[10] The court notes that in her complaint, Burrows indicated, for the first time that she was treating with Michelle M. Merritt, Ph.D., a psychologist. (Doc. #1 at 1).

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 28, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager